**IN THE UNITED STATES DISTRICT COURT**
**FOR SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RAQUEL VEGA MARTINEZ,** | § | |
| **HUGO VEGA,** | § | |
| **DBA AIRLINE** | § | |
| **INSURANCE** | § | |
| *Plaintiff* | § | |
| | § | **CASE NO. 22-CV-02767** |
| **v.** | § | |
| | § | |
| **CAPITAL ONE N.A.,** | § | |
| *Defendant* | § | |

## FIRST AMENDEMENT TO PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, RAQUEL VEGA, DBA AIRLINE INSURANCE and HUGO VEGA, hereinafter referred to as Plaintiff whether they be one or more, complaining of CAPITAL ONE N.A., hereinafter referred to as Defendant, or ("Capital One") whether they be one or more, and would respectfully show the Court the following:

### I.    PARTIES

Plaintiff Raquel Vega is a resident of Harris County, Texas. Plaintiff may be served with papers and process through her attorney of record, Ricardo L. Ramos.

Plaintiff Hugo Vega is a resident of Harris County, Texas. Plaintiff may be served with papers and process through his attorney of record, Ricardo L Ramos.

The Defendant, Capital One N.A is a Delaware Corporation and doing business in Harris County, Texas. Defendant may be served with papers and process through their registered agent Corporation Service Company, located at 701 Brazos Street, STE 1050, Austin, Texas 78701.

### II.    JURISDICTION

Venue is proper in Harris County as the Plaintiffs are residents of Harris County and all or a substantial portion of the events occurred within Harris County, The Court has jurisdiction over the parties.

### III.    BACKGROUND

At all times material to this cause, Plaintiff was the sole proprietor of Airline Insurance. Airline Insurance was registered in Harris County on March 15, 2012 and operates as an independent insurance agency and multi service company in Harris County Texas. Please see attached hereto Exhibit P-6 for all purposes. Airline Insurance had four locations in the Houston area and at the times material to this suit consisted of eight employees.

Plaintiff and her husband, Hugo Vega, opened a business account with Capital One for Vega Seguros & Multi Service in or around February 2018. Hugo Vega is sole proprietor of Vega Seguros & Multi Service. In 2019 Plaintiff decided to open a business account with Capital One as well, considering that she and her husband also held a joint checking account and credit cards with the bank.

In response to the Covid-19 pandemic, Raquel Vega applied for and received a PPP loan on behalf of Airline Insurance from Customers Bank in the amount of $7,292.00. Raquel Vega was approved for the loan on April 18, 2021 and the funds were disbursed to the business checking account for Airline Insurance with Capital One N.A.. Airline Insurance used the funds for approved purposes under the CARES Act by using loan proceeds on payroll costs and other eligible expenses, related to payroll within her business.

Plaintiff spent all the proceeds on payroll costs for her employees and not for her own payroll. Customers Bank forgave the PPP loan on October 8, 2021. Please see attached Exhibit P-1 in support.

On or about October 8, 2021 Plaintiff was made aware that her business account was frozen by Capital One Bank when business transactions began to be declined. Capital One N.A. gave no notice to Plaintiff and made no attempt to communicate with Plaintiffs regarding their decision to take control over the funds in the account belonging to Airline Insurance. Plaintiff attempted to login to the Capital One Banking App and discovered that all her accounts were restricted and she could no longer view any of her accounts.

Plaintiff called Capital One and was informed that Capital One had frozen her Airline Insurance business account and all of her bank accounts not associated with Airline Insurance, and that Capital One would be closing all the accounts due to an "unauthorized PPP loan.". Plaintiff informed Defendants that they were incorrect and demanded that the assets of Airline Insurance remain available to her but, Capital One refused to do so. Instead, Defendants required Plaintiff to provide evidence that she in fact had employees and proof that Airline Insurance was in operation.

Plaintiff complied with their request for production of documents, despite the fact that Defendant's should have reasonably been able to confirm operations and payroll themselves through their superior access to Plaintiff's business transactions. Please see Exhibit P-2  attached here in support. Plaintiff sent Capital One her tax returns which included Airline Insurance income and expense and cost of labor.

 Plaintiff has made countless calls to Capital One and been subjected to hours in hold times and circular transfers when attempting to remedy this matter. Each time Plaintiff speaks to Capital One she is told that she will need to send her documents to prove existence of her business and employees and wait for the review of said documents. Plaintiff has sent the documents as instructed and each time she follows up, Plaintiff is told that the documents were not received or that they are in the process of reviewing the documents. Please see Exhibit P-3 in support.

Plaintiff was a consumer account holder and used the business account with Capital One to make payroll, pay rent for the business locations, and a portion of the monies in the account were specifically received by Plaintiff from clients and entrusted to the Plaintiff for safekeeping. A portion of these monies received, were especially entrusted to Plaintiff so that they could be forwarded to specific entities; Department of Public Safety, Harris County, The Tax Assessors of Harris County and its contiguous counties, the Internal Revenue Service or to the respective insurance carriers for whom the monies were collected for insurance premiums of various insurance companies.

Plaintiff was a consumer account holder and a natural person who held a personal joint checking account with Capital One, primarily for personal, family, or household purposes.

Defendants, Capital One, continue in their refusal to release the funds belonging to Airline Insurance. Defendants were made aware that not only was the Airline account used for payroll, but the Airline Insurance account was an account where daily deposits were made on behalf of clients who had made payments for their insurance premium. As another service Airline Insurance offers title services for individuals who wish to renew their auto registration or title newly purchased vehicles. Whichever service provided, Plaintiff made it clear to the Defendants through clear evidence, that painted an illustration of daily operations and supported Plaintiff's assertion that a portion of the funds in the Airline Insurance account were special funds. Plaintiff made special deposits daily, these deposits consisted of Plaintiff placing these special kinds of money in the possession of Capital One, with an obligation of Capital One to make available or to return the identical funds deposited. Plaintiff at all times retained title to these special funds and was expected to be the owner or controller of all monies deposited into any and all accounts Plaintiff held with Capital One.

At no time prior to the filing of this lawsuit did Plaintiff ever enter a debtor/ creditor relationship with Capital One. At all times Plaintiff was a consumer and owner or controller of checking accounts for which she maintained a consumer relationship with Capital One. Any monies that Plaintiff deposited into the accounts held with Capital One, was deposited with the understanding and agreement that it is to be devoted to the specific purpose of payment to third party entities, for presentment of checks. All deposits into the Airline Auto Account, constituted a special deposit, held by Capital One as an agent of Plaintiff.

As of the date of the filing of this amendment, Capital One has failed to release the monies that Plaintiff is entitled to possession of. Capital One continues to exercise control over the monies that remain in the account and Capital One continues to deprive Plaintiff of her right of possession.

Capital One is guilty of wrongful acts of dominion over Plaintiff's accounts and of denying Plaintiff her rights to the monies in the account as owner of the account. Defendant is guilty of tortious taking in their unlawful restrictions on Plaintiff's accounts. Defendants continue to refuse to give up possession of the monies in the account even after Plaintiff has demanded that Defendant do so.  Defendants have failed to provide any explanation for their actions and every inquiry into the matter has revealed no results to their purported investigations. There exist no court order, judgements, liens or garnishments, indicating that the actions taken by Capital One are proper or that Capital One has a meritorious claim of right of in opposition to the rights of Plaintiff.

Finally in January 2022 Plaintiff sent a final demand for the release of the funds which were frozen and notice of Deceptive Trade Practices. Defendants did not respond.

As of the date of the filing of this lawsuit Defendants continue to deny Plaintiffs online access to the Airline Auto Insurance account, Defendants continue to deny Plaintiffs access to the funds within the account. Defendants refuse to close the account and Defendants continue to debit

the account monthly for a maintenance charge of fifteen dollars ($15.00). Please see Exhibit P-4 in support. Plaintiff will show evidence of this maintenance charge that continues to deplete the remaining balance of the funds locked in the Capital One account that Plaintiff can not access, despite demanding that the account be closed and the funds be returned to Plaintiff.

Airline Insurance is an insurance agency who collects payments from the insured for their monthly premiums, that money is then deposited into the account belonging to Airline Insurance and later swept out of the account by the insurance company or carrier within two to three business days. The Plaintiff informed Capital One that at the time they froze the account belonging to Airline Insurance, a portion of the funds belonged to Infinity Auto Insurance Group and Commonwealth Casualty Company and had been collected from client's on behalf of the Insurance company. If these payments were not made on behalf of the clients, Plaintiff could leave clients without coverage or be accused of misappropriation of funds after collecting the funds and not making them available to Infinity Insurance group and Commonwealth Casualty Company.

Plaintiff contends that the funds received in PPP loan were used on payroll and the funds that were frozen by Capital One did not belong to Plaintiff and as a result of Capital One's actions Plaintiff could have lost her appointment with Infinity Insurance Group. For every payment Infinity Insurance Group and Commonwealth Casualty Company attempted to collect and for which was returned unpaid, Airline Insurance was charged $30.00 for the total of $510.00 in returned transactions from the insurance companies. Airline Insurance was also told by the insurance companies that the payment was due immediately for the transactions and fees for the sum of $2824.12 for the premium which had been collected from the clients and was frozen in the Capital One business account. Airline Insurance was allowed a payment plan with Infinity Insurance Group who agreed to take the funds from the future commission checks of Airline

Insurance. However, Commonwealth Casualty Company was not so compassionate and promptly terminated their relationship with Airline Insurance and subsequently with Vega Seguros as well once the payment was not made for the NSF transactions and held all commission checks. Please see attached Exhibit P-14 in support of the Plaintiffs claims that Commonwealth Casualty Company terminated the appointment with Plaintiffs for no other reason other than the fact that Defendants reported to Commonwealth that Plaintiffs had insufficient funds to cover transactions for the monies which were collected on behalf of the clients for their insurance coverage.

Additionally, Airline Insurance offers title services for clients. In this service, Airline Insurance collects the cost of title, tax, registration and license plates from the client and deposits that money into the business account. Then as a service Airline Insurance will prepare the documents on behalf of the client and a runner will go to the Harris County Tax Office and process the title change for a fee. A portion of the funds that were frozen were collected on behalf of the Harris County Tax Office, and as a result of Capital One's actions the business faced a true risk of losing it's license to conduct business as a title service in Harris County.

In fact, each and every transaction that was scheduled to go through the account was returned unpaid. There were a total of (6) six checks returned to the Harris County Tax Office for title services that the business had conducted. The Harris County Tax Office demanded payment and threatened Raquel Vega and Hugo Vega with criminal action if the checks were not paid along with and additional $30.00 returned check fee. Please see attached Exhibit P-4 in support. Harris County Assessor-Collector sent a 10 day demand, for checks in the total amount of $4,808.55 and additional returned check fees brought the total due to $4,988.55. Plaintiffs were also informed that if the total was not paid the titles, registration and license plates in possession of clients would

be shown as invalid. Clients of Airline Insurance title service company were also sent a notice that their title or registration would be cancelled for a returned check. Please see Exhibit P-5 in support.

Payroll was delayed and Airline Insurance was forced to pay it's employees from funds which belonged to Vega Seguros & Multi Service. The payroll company blocked the payroll account with Airline Insurance because they could not debit the business account, this action resulted in losing access to employee hours, withholding totals, employee insurance and 401k contributions required to be made by Airline Insurance. Please see Exhibit P7- in support

The actions of Capital One effectively soured several business relationships, clients began to call the office and appear in person, demanding their money back and accusing the business publicly of theft. The situation became so tense and therefore creating an uncomfortable environment for staff and also causing concern for themselves after hearing accusations of theft and being accused by clients directly of fraud. At least one valuable employee resigned after reporting being pressured by her family that she might be blamed for the transactions she processed for clients. Another staff member resigned after the stress of the clients calling and leveling accusations of theft and threatening staff over refunds for title transactions coupled with delays in payroll.

The merchant services account which is used to accept credit card transactions for clients at 3 locations was set up to deposit funds collected from clients and credited to the Airline Insurance account in 2 to three business days. Though the account was frozen, Capital One did not inform the Plaintiff that though they were refusing to pay transactions and checks, they did continue to accept deposits and continued to accept automatic commissions and credits from payments that clients had made with credit cards. The total sum of Merchant processed credit card

payments collected by Defendant and held was ($ 18,870.44) eighteen thousand and eight hundred seventy dollars and forty four cents. Please see in support, Exhibit P-8 in attached hereto.

Upon Plaintiffs' discovery of the frozen account and after losing more than a weeks' time attempting to resolve the matter with Capital One, to no avail; Plaintiffs opened accounts with Chase Bank and Wells Fargo in order to continue doing business. Upon opening the accounts, it took an additional week before Airline Insurance and Vega Seguros could switch the accounts out to accept credit for commissions and payment credits which had normally gone to Capital One.

During this time, Capital One continued to accept deposits made for commissions earned, continued to accept credit card transactions, continued to accept any credit to the Plaintiffs' personal and business account and to deprive the Plaintiff of access to the banking app, to access by phone through any type of automated system, and to access through the ATM. Capital One refused to grant Plaintiffs any authority over their personal funds or their business funds.

Capital One also continued to accept Zelle payments on the joint personal checking account and from clients who were accustomed to sending their monthly payment directly to the Plaintiff's personal checking account for services provided via Zelle money transfer option. One such payment was for $480.00 which was rental payment for a mobile home under mortgage by Raquel Vega, which is rented to a tenant and another for $20 which was sent to Plaintiff's daughter for food by the child's father from a previous marriage. The twenty dollars was subsequently locked in with all the frozen funds. The little girl was 14 and home alone that day unable to order food delivery. Please see Exhibit P-9 in support.

In or around March 2022 Capital One closed the Plaintiffs' personal joint checking account and mailed Plaintiff a check for the funds that remained in the account. The damage had been done by this time, as a result of Capital One locking Plaintiffs' personal account, and business accounts

whilst continuing to accept credits and deposits the Plaintiffs defaulted on credit accounts. The business became delinquent in rental payments and in an effort to survive the snowball effect which came as a result of Capital One's actions, Plaintiffs closed one location and laid off 4 employees. Though the Plaintiffs were eventually able to pay the Harris County Tax Assessor and the insurance companies, they now retain 4 employees and operate 2 locations.

Only recently in April 2022 were the Plaintiffs able to catch up on the rent for both remaining locations and were forced to rent out their home and are currently staying in the guest room of a friend so that they were able to recover from the financial setback Capital One caused. The Plaintiffs primary residence was nearly defaulted on the loan and the mortgage company which holds the loan on a rental property is still threatening foreclosure. Capital One is the direct cause of the financial hardship Plaintiffs have been faced with and the proximate cause of Plaintiff Raquel Vega's credit being ruined.

The score on the Plaintiff's credit report has significantly decreased her purchasing power, blocked her ability to borrow to try to escape the burden that Capital One imposed on Plaintiff. Capital One even returned the autopay for the Capital One credit card, which was set up for debit on Plaintiff's personal account with Capital One bank which had a balance of over $3,000.00 dollars. Then Capital One credit in turn charged a $30.00 fee for the declined transaction and later charged off the credit card debt which is still in collections. Please see attached here Exhibit P-10 in support.

Airline Insurance was closed in the shut down for COVID-19 that effected the Houston area in 2019, then there was the difficulty of dealing with an employee having COVID-19 and shutting down again to allow staff to quarantine, combined with the fact the countries longest government shut down had essentially delayed tax season in 2019. The revenue from tax season

is vital to operations and makes up at least 50% of total income, a significant part of Plaintiffs earnings. In 2021 Airline Insurance was in a very delicate time and despite these set backs, the company had managed to survive and had not lost any staff.

Coming out of a difficult period and avoiding recession, Airline Auto Insurance was barely keeping afloat and already struggling to pay basic cost of operations. The thought of financial help from the CARES Act in early 2021 sounded like the last hope to pick the business up above water. The funds from the PPP program were welcomed as the company prepared for tax season with no government shut down, the IRS was clearing out their back log and the company was hoping for a profitable year in tax season and immediately after. This hope was relying on previous years' trends of car buying that brought revenue of title transactions and insurance sales. Plaintiff was hopeful they could just get through the final preparations to meet training and beefing up staff before tax season came to an end.

Plaintiffs used all Paycheck Protection Program (PPP) loan proceeds as permitted under the CARES Act. The Small Business Administration (SBA) requires that at least 75% of the loan proceeds be used for "payroll costs." Further, at least 75% of the forgiven amount must be attributable to "payroll costs," and no more than 25% of the forgiven amount may be attributable to eligible expenses other than "payroll costs."  Plaintiffs have met that burden as Plaintiff used 100% of the loan for payroll costs.

## V.    PAYROLL PROTECTION PROGRAM

Eligibility in relevant parts per SBA guidance states;

*3. Eligibility Requirements:*

- *<u>General eligibility requirements</u>: The eligibility requirements for Second Draw PPP Loans are narrower than the eligibility requirements for First Draw PPP Loans. The Economic Aid Act, as amended by the ARP Act, provides that a borrower is eligible for a Second Draw PPP Loan only if the borrower meets all of the following eligibility requirements:*

       ○  *It is a business concern, independent contractor, eligible self-employed individual, sole proprietor, nonprofit organization eligible for a First Draw PPP Loan, veterans organization, Tribal business concern, housing cooperative, small agricultural cooperative, eligible 501(c)(6) organization or destination marketing organization, eligible nonprofit news organization, additional covered nonprofit entity, or eligible Internet publishing company;\*

- *It employs not more than 300 employees, unless it satisfies the alternative criteria for businesses with a North American Industry Classification System ("NAICS") code beginning with 72, eligible news organizations, 501(c)(3) nonprofit organizations, additional covered nonprofit entities, 501(c)(6) organizations, eligible destination marketing organizations, and eligible Internet publishing organizations;*

- *It experienced a revenue reduction in 2020 relative to 2019 (described further below);*

*Revenue reduction requirement: To be eligible for a Second Draw PPP Loan, the borrower must have experienced a revenue reduction of 25% or greater in 2020 relative to 2019, which is calculated as follows.*

- *Calculation: To determine the reduction, the borrower must compare the borrower's quarterly "gross receipts" for one quarter in 2020 with the borrower's "gross receipts" for the corresponding quarter of 2019. Alternatively, the borrower may compare annual gross receipts in 2020 with annual gross receipts in 2019 (see below). For all loans, the appropriate reference quarter depends on how long the borrower was in operation. The Second Draw Rules, the applications, and the guidance provide that a borrower has experienced a reduction in calendar year 2020, measured as follows, if the borrower:*

       ○  *had gross receipts during the first, second, third, or fourth quarter in 2020 that demonstrate at least a 25% reduction from the borrower's gross receipts during the same quarter in 2019 (for example, a borrower that had gross receipts of $50,000 in the second quarter of 2019 and had gross receipts of $30,000 in the second quarter of 2020 experienced a 40% revenue reduction between these two quarters);*

       ○  *was not in business during the first or second quarter of 2019, but was in business during the third and fourth quarters of 2019, the borrower had gross receipts in any quarter of 2020 that demonstrate at least a 25% reduction from the borrower's gross receipts during the third or fourth quarter of 2019 (for example, a borrower that had gross receipts of $50,000 in the third quarter of 2019 and had gross receipts of $30,000 in the third quarter of 2020—demonstrating a reduction of 40% from the borrower's gross receipts during the third quarter in 2019);*

       ○  *was not in business during the first, second, or third quarter of 2019, but was in business during the fourth quarter of 2019, the borrower had gross receipts in any quarter of 2020 that demonstrate at least a 25% reduction from the fourth quarter of 2019 (for example, a borrower that had gross receipts of $50,000 in the fourth quarter of 2019 and had gross receipts of $30,000 in the fourth quarter of 2020—demonstrating a reduction of 40% from the borrower's gross receipts during the fourth quarter in 2019);*

       ○  *was not in business during 2019, but was in operation on February 15, 2020, the borrower had gross receipts during the second, third, or fourth quarter of 2020 that demonstrate at least a 25% reduction from the gross receipts of the entity during the first quarter of 2020 (for example, a borrower that had gross receipts of $50,000 in the first quarter of 2020 and had gross receipts of $30,000 in the*

*fourth quarter of 2020—demonstrating a reduction of 40% from the borrower's gross receipts during the first quarter in 2020); or*

o    *alternatively, was in operation in all four quarters of 2019 and experienced a reduction in annual receipts of 25% or greater in 2020 compared to 2019 and the borrower submits copies of its annual tax forms substantiating the revenue decline. The amounts required to compute such receipts vary by the entity tax return type*

Upon applying for the PPP loan, Plaintiff applied to Customers Bank and was at no time given any terms to abide by under any authority of Capital One.

Plaintiff entered into no agreement with Capital One nor did she ever seek out their criteria when applying to eligible lenders.

The loan was issued by Customers Bank and Capital One had no authority to collect on the loan. And in the event that Capital One alleges it was in its authority to collect, the loan had already been forgiven and there was no balance due to collect. Additionally, Capital One's in holding Plaintiff's funds with claims that they were obtained improperly are actions in contrary to their express warranty as stated in their Rules Governing Deposit Accounts. Please see Exhibit P-1, page 2 where is stated in relevant part;

"Accepting Items for Deposit. We will accept items for deposit, but only act as your agent for collection and assume no responsibility for those items, beyond ordinary care."

Capital One accepted the PPP deposit from Customers Bank and Customers Bank had authority as a lender to collect on the loan and Capital One had no duty to interfere with the relationship between Customers Bank and Plaintiff. Defendant's breach in that duty to use nothing more than ordinary care.

Further, per Capital One's Rules Governing Deposit Accounts, if Capital One had received conflicting instructions with respect to an account, or notice of adverse ownership, right to control, or access to funds in an account may have been obtained through fraudulent or criminal acts,

Capital One gave written warranty that a hold may be placed on the funds in an account holders account and refuse to honor transactions until all appropriate parties provide us with instructions with respect to the disposition of the funds.

Capital One expressly states on page 13 of Exhibit 1, that Defendants are not required to determine whether a dispute has merit. Yet Defendants continue to withhold Plaintiffs funds, in the absence of any requests for investigation from Customers Bank. Defendants have reported to Plaintiff that it is their own duty as guardians to make their own determination as to whether or not Plaintiff received and spent PPP funds appropriately, and further asserted to Plaintiff that Defendants were in authority to make the determination on stricter guidelines than those issued by the CARES program.

When applying for the PPP loan, Plaintiff was informed that the lender must consider the following criteria when reviewing her application:

(i)      whether applicant was in operation on February 15, 2020;

(ii)     whether applicant had employees for whom it paid salaries and payroll taxes; and

(iii)    whether applicant paid independent contractors, as reported on a Form 1099-MISC. Plaintiff met each and every one of these criteria

Plaintiff was also required to make the following good faith certifications:

(i) the uncertainty of current economic conditions makes the loan request necessary to support ongoing operations;

(ii) the borrower will use the loan proceeds to retain workers and maintain payroll or make mortgage, lease and utility payments;

(iii) the borrower does not have another paycheck protection loan application pending for a loan duplicative of the purpose and amounts applied for; and

(iv) from February 15, 2020 to December 31, 2020, the borrower has not received another paycheck protection loan duplicative of the purpose and amounts applied for.

Plaintiff has met each and every one of the criteria to be eligible for the PPP loan received for Airline Auto Insurance. Plaintiff certifies that Plaintiff was in conformity with each and every good faith certification.

In or around April of 2022, Plaintiff received a bank statement for Airline Insurance showing that on March 25, 2022 there was a check paid for the amount of $7,292.00, when Plaintiff called Capital One she was told that no information can be given to her and she was transferred to the fraud department. Capital One fraud reported that they could not give any information on who authorized the check but that someone would contact Plaintiff by phone and no more information could be given. Please see Exhibit P-12 in support.

Plaintiff did not draw any check or authorize for any check to be paid from the Airline Insurance business account improperly frozen by Capital One. In the event that Capital One alleges that Plaintiff did authorize the check to be paid, Plaintiff contends that Plaintiff has be denied access to the account and as of the day of the filing of this motion Plaintiff can not even view the accounts online. Please see Exhibit P-11

Capital One has no authority to issue any check on behalf of Airline Auto Insurance and has no authority under their own posted guidelines to determine the repayment of the PPP loan issued to Airline Auto Insurance.

## VI.    CAUSE OF ACTION

## Conversion

Capital One by its actions of unlawfully freezing the personal account of Plaintiffs and the business account for Airline Insurance have deprived Plaintiffs of rightful ownership interest in

their bank accounts, thus depriving Plaintiffs of their property and their conduct has caused the Plaintiffs to suffer harm, financially and to their reputation and good name.

A conversion of personal property occurs upon the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Pipes v. Hemingway, 358 S.W.3d 438, 449-50  (Tex. App.-- Dallas 2012, no pet.).*

Capital One N.A. by its conduct is guilty of conduct in violation of Business and Commerce Code Ch 3 Section 3.411 Refusal to Pay Cashier's Checks and Ch 3 Section 3.420 Conversion of Instrument.

## Breach of Fiduciary Duty

Plaintiffs entered into a banking relationship with the Defendants, this relationship was in the interest of both parties. The Defendants market themselves as a financial institution held to a standard superior to other financial institutions. Yet in their conduct with Plaintiffs this implied standard is not adhered to by the fiduciary. The breach in Defendants duty is in extraneous facts conduct as Defendants have blocked Plaintiff's access to fund deposited to Plaintiff's account by Customers Bank. The Defendants have launched an investigation and assertion of guidelines to determine whether or not Plaintiff received the PPP funds appropriately or not. It is beyond an ordinary bank-customer relationship for Capital One to impose restrictions or audits on a loan for which they hold not interest.

Defendants failed to act in the best interest of Plaintiffs, there has been a breach of fiduciary duty. Defendants breached their fiduciary duty to Plaintiff and as a result Plaintiff has suffered irreparable injury, financial loss as well as damage to the reputation of Plaintiff's business.

Upon opening a business checking account Plaintiff at no time entered into any agreement authorizing Capital One N.A., to take control over funds that were rightfully and legally possessed as property of Plaintiffs, neither did Plaintiff ever grant authority to Defendants to pay any debts on Plaintiffs behalf.

(1) the plaintiff owned or had possession of the property or entitlement to possession;

(2) the defendant unlawfully and without authorization assumed and exercised dominion or control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner;

(3) the plaintiff demanded return of the property;

(4) the defendant refused to return the property; and

(5) the plaintiff was injured by the conversion.

The Defendant unlawfully deprived Plaintiff of property and is liable for damages resulting from their unlawful conduct.

## Breach of Warranty

Defendants are guilty of breaching their Express Warranty by actions which are improper and unauthorized. Defendants market that they are a financial institution that can be trusted and where the Plaintiff's money will be safeguarded. The Defendants market themselves and offer "Business checking you can count on for your basic cash flow management needs" according to their website as of the day of the filing of this amendment.

Defendants are guilty of breaching their Merchantable Duty, by use of actions which are not performed as the Defendant so marketed. Defendants market that they will make funds available to their account holders by promoting the ease access to funds and the benefit or extended hours, multiple locations, and numerous ATM locations. No where do Defendants market

themselves as guardians of third party lenders, auditors of disbursements from legitimate third party lenders, or even stewards of their account holders government assistance.

Defendants are guilty breaching their Duty of Fitness, by failing to provide service or resolution as their employees or agents insured they would. Defendants reported to Plaintiffs on multiple occasions that the freeze would be remedied, and each and every time Plaintiff called and met the requests of Defendants, the Defendants failed to perform their duty in resolution. Instead Defendants continuously subjected Plaintiff to circular automated transfers through various departments while enduring excessive hold times. Plaintiff believes that Defendants intended to wear Plaintiff down by running her in circles in hopes that Plaintiff would give up. In the alternative, the Plaintiff being outsourced to call centers with no native English speakers contributed to the inactivity of Defendants employees.

## Unconscionable Acts

The Defendants are guilty of taking advantage of Plaintiffs' who are consumers, lack of knowledge, ability, experience, or capacity to a grossly unfair degree. The Defendants have shown no since of urgency in making Plaintiffs funds available to the business, or to the Plaintiffs. Even when the Plaintiff's were provided with all the proofs required, Defendants did nothing to resolve the error Defendants made when asserting the Plaintiffs had acquired the PPP loan improperly.

The negligent failure of the Defendants to investigate and affirm their own contentions caused the Plaintiff to suffer financial losses, loss of future earning potential and to appear diminished in capacity to Plaintiff's peers and employees.

## Defamation, Negligence

Capital One has caused the breakdown of business relationships that threaten the future of the business' success and ability to operate. Because of Capital One and their unauthorized acts

Airline Insurance has been threatened with criminal prosecution and threats of litigation from concerned clients regarding the funds they entrusted to Plaintiffs which are still frozen by Defendants.

The Plaintiffs were forced to close a location, their credit ruined trying to pay for transactions which should have been paid with funds that Capital One will not make available.

Plaintiffs were not able to meet the cost of their personal living expenses while Capital One unlawfully froze their personal joint account as well.

The actions of Capital one led to characterization of the Plaintiff's business, and had Capital One not frozen Plaintiff's account or in the alternative, had the Defendants made the funds available after evidence was provided in support of the Plaintiff's eligibility for the PPP Loan; Plaintiff's business would not have been subjected to the disparagement its employees and Plaintiff's publicly endured.

Plaintiff will show that Defendants did in fact publish error codes on their returned transactions that falsely communicated to all the accounts payable during the months immediately following their blocking access of Plaintiff to Plaintiff's accounts. Please see attached hereto Exhibit 13 attached hereto directly in support. These return codes were written and sent to Plaintiff's business parties and to third parties, all of which were able to understand and to communicate to Plaintiff that they had received the returned transactions, which defamed Plaintiff and caused the breakdown of relationships Plaintiff maintained and for which were necessary to Plaintiff's business. Defendants by their defamatory publishing of false return codes caused the Plaintiff to be viewed in a damaging light. Plaintiff lost stature in business relationships as a direct result of the actions of Defendants.

Not only did the Defendant cause irreparable harm to the Plaintiff's finances, business and relationships, the Plaintiff Raquel Vega has begun to suffer alopecia, anxiety attacks and high blood pressure.

Plaintiff Hugo Vega has been plagued with high blood pressure and debilitating anxiety and depression related to his work environment and the stress involved with it since the actions of Defendants.

The injuries that Plaintiffs have suffered are a direct and proximate cause of Defendant's actions.

## VI.    RELIEF

Plaintiff seeks award for the damages to their good name, and further damages for the income Plaintiff would have received had they not been forced to close one of their locations after their financial hardships which were a direct result of Capital Ones negligent conduct.

Plaintiff seeks a Restoration Order

Plaintiff seeks Interest

Plaintiff seeks any other relief that the Court deems proper, fair and equitable and for which the Plaintiff has not requested.

Plaintiff has no other remedy at law available to them and requests the Court after notice to Defendants to grant any other relief that Plaintiff might be entitled to and for which Plaintiff may not have requested.  Plaintiff has suffered irreparable injury, loss, and damage to homestead, business, and livelihood. This injury will persist without the intervention of the Court.

## VIII.   TEXAS DECEPTIVE TRADE PRACTICES ACT

Plaintiff incorporates by reference all of the paragraphs above and below.

Texas Law prohibits businesses from engaging in deceptive trade practices.

(i) The Plaintiffs are consumers and were engaged in an account holder relationship with the Defendant;

(ii) The Defendant engaged in false, misleading, or deceptive acts when they improperly froze the Plaintiffs account with no lien, n judgement and in the absence of any request from a third party lender to do so; Defendants deceived Plaintiff when falsely promising to remedy the matter and requesting that Plaintiff redundantly send various documents, for the purpose of delay with no intention of resolution; and Plaintiffs deceived Plaintiff and intentionally ran Plaintiff in circles.

(iii) The acts of Defendants were a producing cause of Plaintiffs' (consumers) damages.

At all times that Plaintiff was party to a "consumer" relationship with Defendant was a consumer of an individual and sole proprietor who was seeking the services of Capital One.

At no time during Plaintiffs' "consumer" relationship with Defendant did Plaintiff ever solicit a loan, enter a lender relationship or ever become a debtor to Defendant.

Plaintiff maintains that Defendants actions constitute a producing cause of economic damages or damages for mental anguish:

Defendants are guilty of the use or employment of false, misleading, or deceptive acts of practice that is specifically described in subsection (b) of Tex. Bus. & Com. Code Section 17.46; Defendants presented to Plaintiff that they were appointed or entitled to conduct an investigation into Plaintiff's spending of PPP loan. Plaintiff was presented with guidance in complying with Defendant's requests for information to determine whether Plaintiff was in conformity with Defendant's rules for PPP spending, which Defendant misrepresented as the SBA's guidelines. Plaintiff, after further investigation discovered that Defendants in actuality, acted on their own and without authority.

Plaintiff relied on Defendants to the detriment of the Plaintiff.

Defendants are guilty of one or more acts described in Tex. Bus. & Com. Code Section 17.46(b) which include:

Passing off goods or services as those of another; when Defendants presented that their specific rules for the use of PPP funds were one in the same with the SBA.

Causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by another; by misrepresenting themselves as appointed by Customers Bank to audit the disbursement of PPP funds which were deposited to Plaintiffs.

Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities which they do not have or that a person has a sponsorship, approval status, affiliation, or connection which the person does not; when Defendants reported to Plaintiff that they had returned the Plaintiffs funds to Customers Bank, when Plaintiff has shown evidence that Customers bank and the SBA deny that the had any affiliation with any ongoing investigation of Defendant and neither did Defendant forward and monies to either Customers Bank or the SBA.

Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; when Defendants represented to Plaintiff that they in fact were in authority to determine the manner in which Plaintiff was to spend the PPP funds simply because they were deposited into Plaintiff's account with Capital One.

Representing that an agreement confers or involves the rights, remedies or obligations which it does not have or involve, or which are prohibited by law; Defendants have represented to the Court and to the Plaintiff that because Plaintiff's funds were deposited into a checking account with Defendants that somehow Defendants were entitled to keep those funds. While representing

publicly and marketing that they would safe guard the funds, while boasting the ease of availability to one's funds online, through multiple locations, or through the use of apps.

Failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed; If Capital One Bank was in some sort of relationship where they were in fact stewards of Customer Banks disbursed PPP funds, and were actually in authority to audit or hold funds, or return funds to the lender as they purported; the Defendants failed to disclose such. Defendants are errored in representing that Plaintiff ever held more than a consumer account holder relationship.

The liability of a bank for action or non-action with respect to an item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located.  In this case the action or non action of Defendants began at the branch when the Defendants first began to run Plaintiff in circles and repeatedly requests that Plaintiff supply the documents necessary to resolve this matter, knowing that Defendants never had any intention of restoring Plaintiff's access to Plaintiff's accounts.

## IX.    REMEDY

Plaintiff is entitled to relief under DTPA

Plaintiff is entitled to economic damages determined by the Court;

Plaintiff requests the Court to find that Defendants guilty of the wrongful conduct alleged by Plaintiff as the acts were "knowingly" committed.  Plaintiff requests the Court to award up to three times the amount of economic damages,

In, Plaintiff requests the Court to award the Plaintiffs additional damages for mental anguish.

Plaintiff requests the Court to find that the Defendants acts were committed "intentionally," Plaintiff requests the Court to award up to three times the mental anguish damages to Plaintiffs.

It was necessary for Plaintiffs to retain the services of Ricardo L. Ramos to defend their rights and interest in this matter. Plaintiff requests the Court Order the Defendants to pay reasonable and necessary attorney's fees, Court Cost and out of pocket expense incurred by the Plaintiffs in litigating this matter.

Alternatively, Plaintiffs request the Court to Grant Plaintiffs the right to bring a cause of action under the DTPA and find the Defendants guilty under subsection (h) A person who violates Section 17.46(b)(26) is jointly and severally liable under that subdivision for actual damages, Court costs, and attorney's fees; and that Defendants should be found liable for actual damages, Court cost and attorney's fees.

## X.    DAMAGES FOR THE PLAINTIFF

Plaintiff incorporates by reference all of the paragraphs above and below.

As a direct and proximate result of the occurrences made in this lawsuit and in this application for temporary restraining orders, the Plaintiff suffered injuries and incurred the following damages:

a.  Statutory and actual damages pursuant to 12.002 (b) (1) (A)-(B) in the amount of $50,000 or greater;

b.  Court Cost

c.  Reasonable attorney's fees in the amount of $25,000

d.  Exemplary damages in an amount determined by the Court.

e.  Damages under DTPA

    f.   Loss of income

    g.   Loss of future income

Plaintiff is pleading for the damages incurred by loss of income related to Capital One's actions and loss of business transactions and the revenue lost as a result of the sabotage by their breach of fiduciary duty and negligence.

Plaintiff would additionally show this Honorable Court and a jury that Plaintiff's damages at this time of filing the Plaintiff's Petition are continuing, but clearly exceed minimal jurisdictional limits of this Court, and expressly reserves the right to amend this Petition concerning damages.

## XI.    PRAYER

WHEREFORE, THE PREMISES CONSIDERED, the Plaintiff prays that the Defendant be cited to appear, and answer herein and that upon final trial thereof the Plaintiff will have judgement against the Defendant for the following:

    a.   Actual or Statutory damages;

    b.   Exemplary Damages;

    c.   Court Cost

    d.   Attorney's Fees

    e.   Damages under DTPA

    f.   Loss of income

    g.   Loss of future income

    h.   All other remedies at law and in equity that the Plaintiff may show themself justly entitled.

Respectfully Submitted,


**RICARDO L. RAMOS, PLLC**
2001 Kirby Drive, Suite 340
Houston, Texas 77019
Tel: (832) 626-1301
Fax: (832) 626-1321
E-service: service@rickramoslaw.com

*/s/Ricardo L. Ramos*
_____
**Ricardo L. Ramos**
State Bar No. 24027648
**Attorney for Plaintiffs**




<u>**CERTIFICATE OF SERVICE**</u>

I certify by my signature above that a true and correct copy of the above and foregoing has been served on all attorneys of record as listed below on December 12, 2022:


*Via Electronic Service*

_____*/s/ Ricardo L Ramos*_____
Name of Submitting Attorney